UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ENSAR SAHINTURK,<br><br>Defendant. | Case No.  20-cv-08153-JSC<br><br>**ORDER RE: MOTION FOR DEFAULT JUDGMENT**<br><br>Re: Dkt. No. 29 |

Facebook, Inc. and Instagram, LLC ("Plaintiffs"), filed suit against Ensar Sahinturk, alleging cybersquatting and trademark dilution in violation of the Lanham Act, 15 U.S.C. §§ 1125(c) and (d), and state law claims of breach of contract and unjust enrichment.  Now pending before the Court is Plaintiffs' motion for default judgment seeking damages, permanent injunctive relief, and attorneys' fees and costs.  (Dkt. No. 29.)  For the reasons set forth below, the Court GRANTS Plaintiffs' motion.

## BACKGROUND

### I.  Complaint Allegations

Plaintiffs are Delaware corporations with their principal places of business in Menlo Park, California.  (Dkt. No. 1 ¶¶ 3-4.)  Instagram is a subsidiary of Facebook.  (*Id.* ¶ 4.)  Mr. Sahinturk is an individual residing in Istanbul, Turkey.  (*Id.* ¶ 5.)  Mr. Sahinturk controlled a network of website domains with names similar to Instagram: jolygram.com, imggram.com, imggram.net, finalgram.com, and ingram.ws (collectively, the "domain names").  (*Id.*  ¶ 26.)  Mr. Sahinturk registered jolygram.com, imggram.com, and imggram.net in his name.  (Dkt. No. 1 ¶ 26.)  Finalgram.com and ingram.ws were registered anonymously; however, Mr. Sahinturk registered these domain names as well.  (*Id.*)

1  "Instagram" is a federally registered trademark, the rights to which are owned exclusively

2  by Instagram.  (Dkt. No. 1 ¶¶ 23, 24; Dkt. No. 1-1 at 5-17.)  Mr. Sahinturk's reference to his

3  services as "Jolygram," Imggram," "Finalgram," and "Ingram" and the listing of copyrights for

4  these names on his websites dilutes the Instagram trademarks ("IG Marks").  (*Id.* ¶ 29; Dkt. No. 1-

5  1 at 38-46.)

6  Mr. Sahinturk created Instagram clone websites that were hosted under these Domain

7  Names by "scraping" thousands of publicly-available Instagram accounts and republishing the

8  improperly collected Instagram user data on Mr. Sahinturk's clone sites.  (Dkt. No. 1 ¶¶ 32, 34.)

9  "Scraping is a form of data collection that relies on unauthorized automation for the purpose of

10  extracting data from a website or app."  (*Id.*  ¶ 30.)  Mr. Sahinturk's clone websites provided his

11  users functions not available in the Official Instagram App or website, such as the ability to

12  download Instagram user data.  (*Id.* ¶ 35.)  Mr. Sahinturk's clone websites also did not require

13  users to agree to Instagram's Terms of Use ("TOU") or any user authentication on Instagram

14  before using the website.  (*Id.*)  Moreover, Mr. Sahinturk generated revenue by displaying ads on

15  his clone websites.  (*Id.*)

16  **II.  Procedural History**

17  In November 2020, Plaintiffs filed this action alleging trademark infringement and state

18  law claims.  (Dkt. No. 1.)  Prior to filing the action, Plaintiffs sent multiple cease and desist letters

19  to Mr. Sahinturk, revoked his access to Instagram and Facebook, and disabled thousands of

20  Instagram accounts that Mr. Sahinturk used to scrape data from Instagram.  (*Id.* ¶¶ 39-40.)

21  After receipt of one of the cease and desist letters, Mr. Sahinturk temporarily stopped

22  operating the jolygram.com website.  (*Id.* ¶ 43.)  Upon discovering that Mr. Sahinturk had

23  resumed operating jolygram.com and continued to operate other websites and to access Instagram

24  by creating additional user accounts, Plaintiffs sent another cease and desist letter to Mr. Sahinturk

25  and disabled his five remaining Facebook accounts.  (*Id.* ¶¶ 44-46.)  Plaintiffs then initiated

26  service through the Convention on the Service Abroad of Judicial and Extrajudicial Documents in

27  Civil or Commercial Matters, 20 U.S.T. 361 (the "Hague Convention") by using the physical

28  address that Mr. Sahinturk previously provided to Facebook.  (Dkt. No. 17 at 2, 4.)  While service

United States District Court
Northern District of California

1   through the Hague Convention was pending, Plaintiffs and Mr. Sahinturk conferred by Zoom

2   videoconference.  (*Id.* at 5.)  During the videoconference, Mr. Sahinturk stated that he had

3   reviewed the Complaint, then proceeded to ignore Plaintiffs' emails following the

4   videoconference.  (Dkt. No. 17-1 at ¶ 6.)  The Turkish Ministry of Justice eventually determined

5   that Mr. Sahinturk's address was invalid and could not serve Mr. Sahinturk in accordance with the

6   Hague Convention.  (*Id.* at ¶ 3.)

7          Plaintiffs thereafter filed a motion to effectuate service by email.  (Dkt. No. 17.)  The Court

8   granted the motion on September 21, 2021, and Plaintiffs served Mr. Sahinturk by email that same

9   day.  (Dkt. Nos. 18 and 19.)  Because Mr. Sahinturk did not respond to the Complaint, Plaintiffs

10  requested entry of default against Mr. Sahinturk on October 13, 2021.  (Dkt. No. 20.)  The Clerk

11  entered default on January 3, 2022.  (Dkt. No. 26.)  Plaintiffs now move for default judgment

12  against Mr. Sahinturk.  (Dkt. No. 29.)

**DISCUSSION**

**I.  Jurisdiction**

15         District courts have an affirmative duty to examine their jurisdiction—both subject matter

16  and personal jurisdiction—when default judgment is sought against a non-appearing party.  *See In*

17  *Re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).

18         **A.  Subject Matter Jurisdiction**

19         The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs

20  plead trademark infringement under the Lanham Act.  (Dkt. No. 1 ¶ 6.)  The Court has

21  supplemental jurisdiction over the state law claims alleged in the Complaint under 28 U.S.C. §

22  1367.  Supplemental jurisdiction exists because these claims emerge from the same nucleus or set

23  of operative facts as Plaintiffs' federal causes of action.  (Dkt. No. 1 ¶ 7.)  Alternatively, the Court

24  has diversity jurisdiction under 28 U.S.C. § 1332 over all causes of action because complete

25  diversity exists and the amount in controversy exceeds $75,000.  (*Id.* ¶ 8.)

26         **B. Personal Jurisdiction**

27         Plaintiffs bear the burden of establishing personal jurisdiction over a nonresident

28  defendant.  *Facebook, Inc. v. Pederson*, 868 F. Supp. 2d 953, 957 (N.D. Cal. 2012).  They make

United States District Court
Northern District of California

3

1   two arguments as to why the Court has personal jurisdiction over c: 1) Mr. Sahinturk consented to

2   the Court's jurisdiction by agreeing to a forum selection clause, and 2) Mr. Sahinturk has

3   purposefully availed himself of the benefits and protections of a California forum.  (Dkt. No. 29 at

4   8-11.)

5                              **1. Forum Selection Clause**

6          Forum selection clauses constitute consent to personal jurisdiction if "freely negotiated"

7   and not "unreasonable and unjust."  *Chain v. Society Expeditions, Inc.*, 39 F.3d 1398, 1406 (9th

8   Cir. 1994) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985)).  Forum

9   selection clauses are presumptively valid, *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10

10  (1972), and courts "apply federal law to the interpretation of the forum selection clause."  *Doe 1 v.*

11  *AOL LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009) (citing *Manetti–Farrow, Inc. v. Gucci Am., Inc.*,

12  858 F.2d 509, 513 (9th Cir. 1988)).

13         "Contract terms are to be given their ordinary meaning, and when the terms of a contract

14  are clear, the intent of the parties must be ascertained from the contract itself.  Whenever possible,

15  the plain language of the contract should be considered first."  *Klamath Water Users Protective*

16  *Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999).  A contract is interpreted as a whole and

17  each part is interpreted with reference to the whole.  *Id.*  "A primary rule of interpretation is '[t]hat

18  the common or normal meaning of language will be given to the words of a contract unless

19  circumstances show that in a particular case a special meaning should be attached to it.'"  *Hunt*

20  *Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77 (9th Cir. 1987) (quoting 4 Williston, *A*

21  *Treatise on the Law of Contracts*, § 618 (W. Jaeger 3d ed. 1961)).  However, when the intent of

22  the parties cannot be discerned, California courts construe ambiguous contract language "against

23  the drafter."  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417 (2019); *see also Royal Alliance*

24  *Assocs., Inc. v. Mora*, No. 3:15-cv-03706-JST, 2016 WL 926907, at *6 (N.D. Cal. Mar. 10, 2016).

25         Here, the operative forum selection clause is found in Instagram's TOU that is applicable

26  to users in Turkey:

27             If you are a consumer, the laws of the country in which you reside
             will apply to any claim, cause of action, or dispute you have against
28             us that arises out of or relates to these Terms ("claim"), and you may

                                            4

United States District Court
Northern District of California

1

> resolve your claim in any competent court in that country that has
> jurisdiction over the claim. In all other cases, you agree that the claim
> must be resolved exclusively in the U.S. District Court for the
> Northern District of California or a state court located in San Mateo
> County, that you submit to the personal jurisdiction of either of these
> courts for the purpose of litigating any such claim, and that the laws
> of the State of California will govern these Terms and any claim,
> without regard to conflict of law provisions.

(Dkt. No. 29-1 at 2, 7.)  A plain reading of this paragraph does not support Plaintiffs' bald

assertion that Mr. Sahinturk consented to a Northern District of California forum.  The forum

selection clause defines "claim" as "any claim, cause of action, or dispute you have *against us* that

arises out of or relates to these Terms ("claim")" (emphasis added).  (Dkt. No. 29-1 at 7.)  Thus,

when the paragraph states that "[i]n all other cases, you agree that *the claim* must be resolved

exclusively in the U.S. District Court for the Northern District of California . . . you submit to the

personal jurisdiction of either of these courts for the purpose of litigating "*any such claim*," (*id.*

(emphasis added)), "the claim" and "any such claim," refers to a claim that the user has against

Instagram.  While the language regarding the user agreeing to submit to the personal jurisdiction

of the California court suggests that "claim" might also apply to claims against the user, the forum

selection clause is ambiguous given that it expressly defines "claim" as a claim by a user.  Because

the language is, at best, ambiguous, the Court construes it against Plaintiffs, *Lamps Plus,* 139 S.

Ct. at 1417, and thus Plaintiffs have not met their burden of showing that the forum selection

clause applies to their claims against Mr. Sahinturk.  *See, e.g., Facebook, Inc. v. Rankwave Co.*,

No. 19-CV-03738-JST, 2019 WL 8895237, at *3-4 (N.D. Cal. Nov. 14, 2019) (holding that

Facebook's claims did not apply to the defendant because the word "claim" in nearly identical

forum selection clause was defined to mean claims that a consumer may have against Facebook);

*see also WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 667-69 (N.D. Cal. 2020)

(finding forum selection clause did not apply to claims initiated by WhatsApp against its users,

including defendant, because definition of "dispute" did not accumulate additional meaning in its

use between the forum selection clause and choice of law provision).

Plaintiffs' motion does not address how the forum selection clause applies to Plaintiffs'

claims.  Instead, Plaintiffs merely cite to the complaint's allegation that Instagram's TOU require

Mr. Sahinturk to submit to this Court's jurisdiction. The problem with this approach, however, is

that the TOU referred to in the complaint (Dkt. No. 1 at 5 n.1) are substantively different from the TOU attached to the motion for default judgment. (Dkt. No. 29-1 at 2, 7.)  While the forum selection clause in the TOU referred to in the complaint expressly applies to any dispute arising between Defendant and Plaintiffs ("you and we agree that any cause of action, legal claim, or dispute between you and us arising out of or related to these Terms or Instagram ('claim(s)')"), that TOU to which Mr. Sahinturk agreed according to Plaintiffs' sworn testimony (Dkt. No. 29-1 at ¶ 4, pp. 2, 7) do not, as explained above.  In other words, the complaint refers to an inapplicable TOU.  Plaintiffs' reliance on *Facebook, Inc. v. Sluchevsky*, No. 19-cv-01277-JSC, 2020 WL 5823277 (N.D. Cal. Aug. 28, 2020), is therefore misplaced.

### 2. Specific Personal Jurisdiction

Plaintiffs have nonetheless otherwise met their burden of showing that the Court has specific personal jurisdiction over Mr. Sahinturk.

For a court to exercise specific jurisdiction, the suit must arise out of or relate to the defendant's contacts with the forum state.  *Bristol-Meyers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017).  "In other words, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  *Id.* (internal quotations and citation omitted).  Thus, "[s]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

The Ninth Circuit applies a three-part test to determine whether a defendant is subject to specific personal jurisdiction: first, a non-resident defendant must purposefully direct his activities or "consummate some transaction" with the forum or its residents, or "purposefully avail" himself of the privileges afforded for conducting activities in the forum, thereby invoking the benefits and protections of the forum's laws; the claim must arise from or relate to these forum-related activities; and the exercise of jurisdiction must be reasonable.  *See Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017).  A plaintiff bears the burden of satisfying the test's first two prongs, and if either is unsatisfied, personal jurisdiction over the defendant is not established.  *Id.*

1    (internal quotations and citation omitted).  California's long-arm statute allows the exercise of

2    personal jurisdiction to the full extent permissible under the U.S. Constitution.  *See Daimler AG v.*

3    *Bauman*, 571 U.S. 117, 125 (2014); *see also* Cal. Code Civ. Proc. § 410.10 ("[A] court of this

4    state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or

5    of the United States.").  California's jurisdictional statute is coextensive with federal due process

6    requirements, and thus the jurisdictional analysis is the same.  *Schwarzenegger*, 374 F.3d at 800-

7    801.

8         The Ninth Circuit has said that "purposeful availment" and "purposeful direction" are "two

9    distinct concepts."  *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 802 (9th Cir. 2004).

10   The purposeful direction test applies to tort claims.  *See Picot v. Weston*, 780 F.3d 1206, 1212 (9th

11   Cir. 2015).

12                          **a.  Purposeful Direction**

13        The Court evaluates "purposeful direction" under the *Calder* three-part "effects" test.  The

14   *Calder* "effects" test requires that the defendant allegedly "(1) committed an intentional act, (2)

15   expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be

16   suffered in the forum state."  *Dole Food Co. Inc. v. Watts*, 303 F. 3d 1104 at 1111 (9th Cir. 2002)

17   (citing *Calder v. Jones*, 465 U.S. 783 (1984)).

18        Plaintiffs argue that Mr. Sahinturk purposefully directed his harmful conduct at California.

19   The Court agrees.  Mr. Sahinturk's use of software to scrape Instagram user data; his infringement

20   of Instagram's famous trademark by cybersquatting and diluting the IG Marks on the clone sites;

21   his refusal to stop when Plaintiffs demanded he cease his unlawful activities; and the development

22   of a business across multiple clone websites which generated ad revenue together constitute the

23   requisite intentional acts, (Dkt. No. 1 ¶¶ 10, 23-29, 32-36, 38-39, 40-47, 65, 73-74, 81, 103).  *See,*

24   *e.g., Sluchevsky*, 2020 WL 5823277, at *4 (finding the scraping of Facebook user data as

25   intentional); *Twitch Interactive, Inc. v. Johnston*, No. 16-cv-03404-BLF, 2018 WL 1449525, at

26   *14 (N.D. Cal. Jan. 22, 2018) (concluding similar trademark infringement and cybersquatting as

27   deliberate, intentional, and willful); *Facebook, Inc. v. Banana Ads LLC*, No. CV 11-03619-YGR-

28   KAW, 2013 WL 1873289, at *4 (N.D. Cal. Apr. 30, 2013) (finding registration of infringing

United States District Court
Northern District of California

7

1  domain names as intentional).  Additionally, Mr. Sahinturk's use of scraping software to send

2  automated commands to Plaintiffs' California-based computers satisfies the "express aiming"

3  element of the *Calder* "effects" test.  *See WhatsApp*, 472 F. Supp. 3d at 673 n.7 ("where a

4  defendant enters a forum state with malicious code and seeks out servers owned by a plaintiff in

5  that forum state and then commits an intentional tort, such conduct is sufficient to find personal

6  jurisdiction").

7          The Court also agrees that Plaintiffs' expenditure of resources in California to detect and

8  remediate the damage done by Mr. Sahinturk's activities, (Dkt. No. 1 ¶¶ 31, 49), underscores that

9  Mr. Sahinturk inflicted harm in the forum state.  *See Sluchevsky*, 2020 WL 5823277, at *4

10  (holding that Facebook was harmed in its California headquarters through time and expense of

11  investigating and remediating damage done by defendant).  Therefore, Plaintiffs have satisfied the

12  first prong of the specific personal jurisdiction analysis with respect to their tort claims.

13          Plaintiffs' claims also arise from forum-related activities in California.  *See Dole Food Co.*

14  *v. Watts*, 303 F.3d 1104, 1113 (9th Cir. 2002) ("[A] corporation can suffer economic harm both

15  where the bad acts occurred and where the corporation has its principal place of business.");

16  *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1054 (N.D. Cal. 2010) (finding

17  second prong satisfied where defendants purposefully directed their conduct at [p]laintiff, "a

18  company headquartered in the forum state, and the harm caused by [de]fendants was felt in

19  California.").  Here, Mr. Sahinturk targeted Plaintiffs' California-based network and caused harm

20  to Plaintiffs in California.  *See, e.g., Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1099 (N.D. Cal.

21  2014 ("arising from" element satisfied where defendant "expressly targeted Yelp, a company

22  located in California, and Yelp suffered injury from [defendant's] scheme in this forum").  But for

23  Mr. Sahinturk's decision to use software to scrape Plaintiffs' servers for content and to republish it

24  on his infringing domain names, Plaintiffs would not have expended resources in California to

25  investigate and remediate Mr. Sahinturk's conduct, nor would Plaintiffs be suing him for

26  cybersquatting and trademark dilution.

27          Therefore, Plaintiffs have met their burden to show that Mr. Sahinturk purposefully

28  directed intentional acts whose harms Plaintiffs suffered in California.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**b. Reasonableness and Pendent Jurisdiction**

Plaintiffs have made a prima facie showing of purposeful direction and an injury arising from Mr. Sahinturk's conduct in California.  Thus, the burden shifts to Mr. Sahinturk to establish that exercising jurisdiction over him would not be reasonable.  *Boschetto*, 539 F.3d at 1016.  Mr. Sahinturk, however, "waived his opportunity to make this showing by failing to participate in this litigation."  *Yelp*, 70 F. Supp. 3d at 1094.  Therefore, the Court does not find that the exercise of personal jurisdiction over Mr. Sahinturk would in this instance be unreasonable, and as such, he is subject to specific personal jurisdiction with respect to Plaintiffs' tort claims.

Furthermore, the Court may exercise pendent personal jurisdiction as to Plaintiffs' contract claims.  "Personal jurisdiction must exist for each claim asserted against a defendant." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (citing *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1289 n.8 (9th Cir. 1977)).  "[A] court may assert pendent personal jurisdiction over a defendant with respect to a claim . . . so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction."  *Id.*  In this case, Plaintiffs' breach of contract and unjust enrichment claims involve the same common nucleus of operative facts as the tort claims.  Thus, the exercise of pendent jurisdiction is appropriate.  Because personal jurisdiction exists over Plaintiffs' contract claims on this basis, the Court does not engage in the purposeful availment analysis.

**II. Service**

The Court must additionally ensure that "the procedural requirement of service of summons" has been satisfied.  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999) (noting that "one becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure.") (citing Fed. R. Civ. Proc. 4(a)).  Federal Rule of Civil Procedure 4(f)(1) permits an individual to be served outside the United States "by any internationally agreed means of service that is reasonably calculated to give notice," including those means "authorized by the Hague Convention[.]"  The Hague Convention requires plaintiffs to forward requests for service of process to the central authority of the defendant's home country.  *See* Hague Convention, art. III.

9

United States District Court
Northern District of California

Plaintiffs attempted to serve Mr. Sahinturk in compliance with the Hague Convention on March 1, 2021 but received a certificate of nonservice five months later from the Turkish Ministry of Justice citing "insufficient address" as the reason service was not completed.  (Dkt. No. 17-1 ¶¶ 2-4.)  Plaintiffs conducted further investigative efforts but were unable to locate a valid address to serve Mr. Sahinturk.  (*Id.* ¶ 7.)  Plaintiffs thus sought leave to serve Mr. Sahinturk via email, (Dkt. No. 17), and did so on September 21, 2021, (Dkt. Nos. 18 and 19.)

Email service is proper "when a company has structured its business such that it could only be contacted via its email address, and email is the method of communication the company utilizes and prefers."  *Bright Solutions for Dyslexia, Inc. v. Lee*, No. 15-CV-01618-JSC, 2017 WL 10398818, at *7 (N.D. Cal. Dec. 20, 2017).  Here, although Mr. Sahinturk was and continues to be a resident of Turkey, he could only be contacted by email as no valid physical address for Mr. Sahinturk existed online.  Additionally, since Plaintiffs' email was not returned as unsent, service was therefore proper.  *See Bright Solutions for Dyslexia*, 2017 WL 10398818, at *7 (service by email was proper when business could only be contacted by email and emails did not bounce back).

### III. Default Judgment

The Court now turns to the appropriateness of entering a default judgment against Mr. Sahinturk pursuant to Federal Rule of Civil Procedure 55(b).  "The district court's decision whether to enter a default judgment is a discretionary one."  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  Courts consider the following factors in determining whether to enter a default judgment: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action[,] (5) the possibility of a dispute concerning material facts[,] (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits."  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Here, consideration of the *Eitel* factors weighs in favor of granting default judgment.

//

//

United States District Court
Northern District of California

**A. Possibility of Prejudice to Plaintiffs**

The first *Eitel* factor considers whether the plaintiff will suffer prejudice if the court denies default judgment. *Craigslist, Inc.*, 694 F. Supp. 2d at 1054-55. Absent a default judgment Plaintiffs are prejudiced by Mr. Sahinturk's continued abuse of Plaintiffs' platforms and their inability to deter Mr. Sahinturk from scraping data from Instagram. *See, e.g., Baskin-Robbins Franchising LLC v. Pena*, No. 19-cv-06657-JSC, 2020 WL 2616576, at *7 (N.D. Cal. May 7, 2020) (finding first *Eitel* factor weighing in favor of default judgment where defendant franchisor continued to use the Baskin-Robbins trademark and system despite having notice of the lawsuit). Thus, this factor favors granting default judgment under the first *Eitel* factor.

**B. Merits of Claims and Sufficiency of Complaint**

The second and third *Eitel* factors, "often analyzed together," require the plaintiff "to plead facts sufficient to establish and succeed upon its claims." *Craigslist, Inc.*, 694 F. Supp. 2d at 1055. After entry of default, the Court takes the well-pleaded factual allegations in the complaint as true, except for those concerning damages. *See Geddes*, 559 F.2d at 560. "The district court is not required to make detailed findings of fact." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

### 1. Cybersquatting

To prevail on a Section 1125(d) cybersquatting claim, a plaintiff must prove that (1) the defendant registered, trafficked in, or used a domain name that is (2) identical, confusingly similar or dilutive to a protected mark owned by plaintiff, and (3) the defendant acted with bad faith intent to profit from that mark. *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010) (cleaned up).

Here, Plaintiffs allege cybersquatting as to five domain names: jolygram.com, imggram.com, imggram.net, finalgram.com, and ingram.ws. (Dkt. No. 1 ¶ 26.) Each of the domains contains similar variations of the protected "Instagram" mark owned by Instagram. *See, e.g., Amazon.com, Inc. v. Expert Tech Rogers Pvt. Ltd.*, No. 20-cv-07405-PJH (JSC), 2021 WL 4461601, at *7 (N.D. Cal. Sept. 22, 2021) *report and recommendation adopted*, No. 20-CV-07405-PJH, 2021 WL 4896120 (N.D. Cal. Oct. 20, 2021) (use of "Alexa" and "Echo" in domains

1   violated § 1125(d)); *Moroni v. Servettini*, CV 17-2363-DMG (AGRx), 2018 WL 1230569, at *2

2   (C.D. Cal. Jan. 19. 2018) (well pled complaint and unopposed evidence are sufficient to establish

3   defendant's mark is "confusingly similar" to plaintiff's mark).

4        Plaintiffs also satisfy the bad faith element.  Mr. Sahinturk made his domains by illegally

5   scraping data from Instagram users and then used the domains to profit from Instagram's mark by

6   monetizing his clone sites.  *See DSPT Int'l.*, 624 F.3d at 1221 ("The 'intent to profit' . . . means

7   simply the intent to get money or other valuable consideration."); *Lahoti v. VeriCheck, Inc.*, 586

8   F.3d 1190, 1202-03 (9th Cir. 2009) (bad faith where defendant "earned income when customers

9   clicked on links when visiting the Domain Name").

10       Therefore, the cybersquatting claim satisfies the second and third *Eitel* factors as sufficient

11  on the merits.

### 2.   Trademark Dilution

13       To prevail on a Section 1125(c) dilution claim, "a plaintiff must show that (1) the mark is

14  famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the

15  defendant's use began after the mark became famous; and (4) the defendant's use of the mark is

16  likely to cause dilution by blurring or dilution by tarnishment."  *Levi Strauss & Co. v. Neverland*

17  *Online Pty Ltd*, No. 19-cv-04178-SBA (JCS), 2020 WL 6931065, at *9 (N.D. Cal. June 8, 2020).

18  Plaintiffs allege that Mr. Sahinturk diluted the Instagram mark by blurring and tarnishment.

19       First, the "Instagram" mark is "inherently distinctive," *see Two Plus Two Pub., LLC v.*

20  *Jacknames.com*, 572 F. App'x 466, 467 (9th Cir. 2014), and Instagram's marks are "'widely

21  recognized by the general consuming public' as being associated with [Instagram's] social media

22  platform," *9 Xiu*, 2021 WL 5707741, at *5.  (*See* Dkt. No. 1 ¶¶ 27-28.)  Plaintiffs registered the

23  "Instagram" trademark in 2010, both in the U.S. and internationally, (Dkt. No. 1 ¶¶ 23-25; Dkt.

24  No. 1-1 at 4-17), which is prima facie evidence of ownership and of "validity of the registration

25  and of the registrant's exclusive right to use."  *Baskin-Robbins*, 2020 WL 2616576 at *8.

26       Second, Mr. Sahinturk made use of the Instagram mark in commerce.  *See* 15 U.S.C. §

27  1127 ("a mark shall be deemed to be in use in commerce . . . on services when it is used or

28  displayed in the sale or advertising of services and the services are rendered in commerce").  Mr.

United States District Court
Northern District of California

1    Sahinturk ran clone sites which featured the Instagram mark and scraped Instagram content.  (Dkt.

2    No. 1 ¶¶ 2, 10, 29, 35.)  He then monetized his clone sites by running advertisements on them.

3    (*Id.*)  Mr. Sahinturk's use of the Instagram trademark began in 2017, well after Instagram had

4    obtained widespread recognition.  (*Id.* ¶ 29.)  Thus, the second and third elements of dilution are

5    satisfied.

6         Last, Mr. Sahinturk's actions are likely to cause dilution by tarnishment and dilution by

7    blurring.  "Dilution by tarnishment" occurs when a famous mark is improperly associated with an

8    inferior or offensive product or service.  15 U.S.C. § 1125(c)(2)(C); *Panavision Int'l, L.P. v.*

9    *Toeppen*, 141 F.3d 1316, 1326 n.7 (9th Cir. 1998).  "Dilution by blurring" occurs when a

10   defendant uses a plaintiff's trademark to identify the defendant's goods or services, creating the

11   possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's

12   product.  15 U.S.C. § 1125(c)(2)(B); *Toeppen*, 141 F.3d at 1326 n.7.  In determining whether a

13   mark or trade name is likely to cause dilution by blurring, the court considers all relevant factors,

14   including: (i) the degree of similarity between the mark or trade name and the famous mark; (ii)

15   the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the

16   owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree

17   of recognition of the famous mark; (v) whether the user of the mark or trade name intended to

18   create an association with the famous mark; and (vi) any actual association between the mark or

19   trade name and the famous mark.  15 U.S.C. § 1125(c)(2)(B).

20        Mr. Sahinturk registered domain names that were similar variations to "Instagram,"

21   scraped Instagram content that he then republished on his clone sites, and the clone sites featured

22   the IG marks in their entirety and closely mimicked the Instagram service.  These allegations,

23   taken as true, sufficiently support a finding of tarnishment and blurring.  *See, e.g., 9 Xiu*, 2021 WL

24   5707741, at *5 (defendant's use of plaintiffs' marks "was likely to cause dilution by tarnishment,

25   at a minimum, because the defendants used the marks in connection with scams"); *Levi Strauss &*

26   *Co.*, 665 F. Supp. 2d at 1097 (finding that plaintiff properly alleged that defendant's use of

27   identical or nearly identical marks presents a likelihood of diluting the distinctive value of

28   plaintiff's marks); *Discovery Comms., Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282, 1291

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1    (C.D. Cal. 2001) (same).  Each action suggests that Mr. Sahinturk likely intended to create an

2    association with the Instagram mark without Plaintiffs' authorization.

3        Plaintiffs have thus established a meritorious dilution claim under the second and third

4    *Eitel* factors.

5                 **3.  Breach of Contract**

6        Under California law, the elements of a breach of contract claim are: "(1) the existence of

7    the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach and

8    (4) the resulting damages to the plaintiff."  *Oasis West Realty, LLC v. Goldman*, 250 P.3d 1115,

9    1121 (Cal. 2011) (internal citation omitted).

10       The parties entered into a valid enforceable contract.  Mr. Sahinturk agreed to Instagram's

11    TOU, which governs the use of the Instagram service, each time he created an Instagram account.

12    (Dkt. No. 1 ¶¶ 37-39, 52.)  *See In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d

13    1155, 1164–67 (N.D. Cal. 2016) (Facebook's user-registration process created binding contract on

14    user).  Under the TOU, Plaintiffs agreed to provide the service and Mr. Sahinturk agreed to refrain

15    from diluting or cybersquatting on Instagram's marks, among other things.  (Dkt. No. 1 ¶¶ 20-22,

16    53-55; Dkt. No. 1-1 at 92-93; Dkt. No. 29-1 at 5.)  Plaintiffs performed on their portion of the

17    contract by providing their services, but Mr. Sahinturk breached the contract when he scraped data

18    from Instagram users, republished it on his clone sites which featured the IG marks, and

19    monetized the clone sites.  (Dkt. No. 1 ¶¶ 53-55.)

20       These allegations are legally sufficient to entitle Plaintiffs to judgment against Mr.

21    Sahinturk on the breach of contract claim.  *See Paramount Citrus Co-op.*, *Inc. v. H & M Produce*

22    *Inc.*, No. 1:08-cv-01210-AWI-SMS, 2008 WL 4716764, at *5 (E.D. Cal. Oct. 24, 2008) (internal

23    citations omitted).

24                **4.  Unjust Enrichment**

25       To state a claim for unjust enrichment, Plaintiffs need only show Mr. Sahinturk received

26    and retained a benefit at Plaintiffs' expense.  *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 943

27    n.22 (N.D. Cal. 2013).  However, under California law, unjust enrichment is a quasi-contract

28    claim, which is not available when an enforceable contract defines the rights of the parties.  *See*

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996).  Here, Plaintiffs' TOU is such a contract.  *See, e.g., Yelp Inc.*, 70 F. Supp. 3d at 1099 (finding that Yelp's Terms of Service is a contract).  Moreover, Plaintiffs have alleged meritorious cybersquatting, trademark dilution, and breach of contract claims, which obviates the need of an unjust enrichment claim to "'fill in the cracks' where other causes of action fail to achieve justice." *Attebury Grain LLC v. Grayn Company*, 721 Fed. Appx. 669, 672 (9th Cir. 2018).  *See also id.* (reversing summary judgment of unjust enrichment claim because other successfully presented claims precluded the need to fill gaps in achieving justice); *Continental Cas. Co. v. Enodis Corp.*, 417 Fed. Appx. 668, 670 (9th Cir. 2011) (upholding district court's dismissal of unjust enrichment claim because insurance policies existed between the parties and plaintiff could have pleaded a breach of contract claim).  The Court thus declines to enter judgment on Plaintiffs' unjust enrichment claim.

### C. Money at Stake

Under the fourth *Eitel* factor, the Court must consider the amount of money at stake in relation to the seriousness of the defendant's conduct.  *Eitel*, 782 F.2d at 1471-72.  "Default judgment is disfavored where the sum of money at stake is too large or unreasonable in light of defendant's actions." *Tech. LED Intellectual Prop., LLC v. Revogi, LLC*, No. 18-CV-03827-JSC, 2019 WL 2716610, at *4 (N.D. Cal. June 27, 2019) (citation omitted).  Conversely, default judgment may be appropriate where it is "tailored to [the defendant's] specific misconduct." *Bd. of Trs. v. Superhall Mech., Inc.*, No. C-10-2212 EMC, 2011 WL 2600898, at *2 (N.D. Cal. June 30, 2011).  Here, 15 U.S.C. § 1117(d) provides for statutory damages of $1,000 to $100,000 per infringing domain name.  Plaintiffs seek $25,000, one-fourth of the maximum statutory damages per infringing domain name.  Were the Court to award the requested damages, Mr. Sahinturk would be liable for $125,000.  (Dkt. No. 29 at 30.)  This amount is not so substantial or unreasonable as to make default judgment unjust and thus this factor weighs in favor of default judgment or at most is neutral.

### D. Dispute Over Material Facts

United States District Court
Northern District of California

1    There is no indication that the material facts are in dispute.  Upon the Clerk's entry of

2   default, Mr. Sahinturk was "deemed to have admitted all well-pleaded allegations" in the

3   complaint.  *See Geddes*, 559 F.2d at 560 ("The general rule of law is that upon default the factual

4   allegations of the complaint, except those relating to damages, will be taken as true.").  Further,

5   evidence submitted by Plaintiffs in support of this motion—the declarations of Michael P. Duffey

6   and Jeff R. R. Nelson—support Plaintiffs' allegations.  (*See* Dkt. Nos. 29-1 and 29-2.)  In the

7   absence of any likely factual disputes, this factor weighs in favor of default judgment.

8        **E. Excusable Neglect**

9        "This factor favors default judgment where the defendant has been properly served or the

10   plaintiff demonstrates that the defendant is aware of the lawsuit."  *Wecosign, Inc. v. IFG Holdings,*

11   *Inc.*, 845 F. Supp. 2d 1072, 1082 (C.D. Cal. 2012).  There is no basis to conclude that Mr.

12   Sahinturk's default resulted from excusable neglect.  Plaintiffs served Mr. Sahinturk via email

13   pursuant to this Court's order permitting alternative service only after unsuccessfully attempting

14   service through the Hague Convention.  (Dkt. Nos. 17, 18, and 19.)  Mr. Sahinturk also stated that

15   he had actual notice of Plaintiffs' lawsuit during a videoconference with Plaintiffs.  (Dkt. No. 17-1

16   at 5.)  Accordingly, this factor weighs in favor of default judgment.

17        **F. Policy Favoring Decision on the Merits**

18        "Cases should be decided on upon their merits whenever reasonably possible."  *Eitel*, 782

19   F.2d at 1472.  However, the existence of Rule 55(b) "shows that this preference, standing alone, is

20   not dispositive.  *Craigslist, Inc.*, 694 F. Supp. 2d at 1061.  "A defendant's failure to answer the

21   complaint makes a decision on the merits impractical, if not impossible."  *Id.*  Given Mr.

22   Sahinturk's failure to appear, a decision on the merits is impossible.

23   **IV. Remedy**

24        A default judgment cannot differ "in kind from, or exceed in amount, what is demanded in

25   the pleadings."  Fed. R. Civ. Proc. 54(b).  In their motion, Plaintiffs forego their damages on their

26   breach of contract, trademark dilution, and unjust enrichment causes of action and instead seek

27   statutory damages and permanent injunctive relief for their cybersquatting cause of action.

28        *//*

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.  Statutory Damages

Plaintiffs seek statutory damages for their cybersquatting claim under Section 1117(d).  Under that section, the Court may award statutory damages between $1,000 and $100,000 for each domain name subject to a bad faith cybersquatting violation, "as the court considers just."  15 U.S.C. § 1117(d).   The Complaint's prayer for relief section pleads statutory damages permitted by law.  (Dkt. No. 1 at 16 ¶ 3.)  Thus, Mr. Sahinturk has been put on notice that he may be subject to a maximum statutory penalty of $100,000 per infringing domain name.

To determine a just award, courts may consider the egregiousness or willfulness of the cybersquatting, use of false contact information to conceal infringing activities, evidence of "serial" cybersquatting—i.e., engaging in pattern of registering and using a multitude of domain names that infringe the rights of other parties—and whether the conduct evidences an attitude of contempt toward the court or the proceedings.  15 U.S.C. § 1125(d)(1)(B)(i) (listing factors that a court may consider in determining bad faith intent); *Verizon Cal. Inc. v. Onlinenic, Inc.*, No. C 08-2832 JF (RS), 2009 WL 2706393, at *3 (N.D. Cal. Aug. 25, 2009).

Plaintiffs ask for $25,000 for each of the following infringing domain names: jolygram.com, imggram.com, imggram.net, finalgram.com, and ingram.ws.  They argue this amount is justified because Mr. Sahinturk acted willfully and in bad faith.  The Court agrees.  He scraped data without authorization from publicly-available Instagram user content, used the IG Marks on his clone sites without authorization, monetized those sites by running ads on them, continued his infringing conduct after receiving multiple cease and desist letters, and concealed his identity as the registrant of the domain names.  Further, Mr. Sahinturk has failed to defend this action, which evidences an attitude of contempt toward the court or the proceedings.  15 U.S.C. § 1125(d)(1)(B)(i).  Although Plaintiffs do not point to any evidence of serial cybersquatting on other parties, *see Ploom, Inc. v. Iploom, LLC*, No. 13–cv–05813 SC, 2014 WL 1942218, at *7 (N.D. Cal. May 12, 2014), the Court finds that an award of $25,000 per cybersquatting violation is well-supported by three of the four bad faith factors.  *See, e.g., Amazon.com, Inc.*, 2021 WL 4461601, at *9 (awarding $25,000 per cybersquatting violation for defendant's willful conduct); *Digby Adler Group LLC v. Image Rent a Car, Inc.*, 79 F. Supp. 3d 1095, 1108 (awarding $25,000

United States District Court
Northern District of California

where willfulness of defendant's conduct was strongly supported); *Verizon Cal. Inc.*, 2009 WL 2706393, at *3–5 (N.D. Cal. Aug. 25, 2009) (awarding $50,000 per violation where each of four factors was strongly supported).

Accordingly, Plaintiffs' request for statutory damages is GRANTED.

## B. Permanent Injunctive Relief

The Court may order permanent injunctive relief "to prevent the violation of any right of the registrant of a mark." 15 U.S.C. § 1116(a). "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by the threat of continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988). A plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

As to irreparable injury, the Lanham Act provides:

> A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction . . . .

15 U.S.C. § 1116(a). Plaintiffs assert a rebuttable presumption in seeking a permanent injunction. (Dkt. No. 29 at 31.)

Plaintiffs have shown irreparable harm if Mr. Sahinturk continues to infringe its trademarks. Instagram has a high degree of consumer recognition and an enormous user base, (*id.* ¶¶ 27, 75), and Mr. Sahinturk's infringement fraudulently trades on that goodwill. *See, e.g., MOM Enters., Inc. v. Roney Innovations, LLC*, No. 20-cv-04850-TSH, 2020 WL 8614101, at *9 (N.D. Cal. Nov. 24, 2020). Second, monetary damages are inadequate to prevent future infringement because Mr. Sahinturk's failure to defend this action or provide assurances to the

Court that he will stop engaging in the infringing conduct means there is no indication the infringement will stop.  *See Adobe Sys. Inc. v. Brooks*, No. 5:08–cv–04044 RMW, 2009 WL 593343, at *3 (N.D. Cal. Mar. 5, 2009).  Third, the only apparent hardship to Mr. Sahinturk is ceasing the unlawful conduct, which is not a hardship for purposes of permanent injunction analysis.  *Triad Sys. Corp. v. Southeastern Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995).  Fourth, an injunction will serve the general public's interest in protecting trademark holders' rights, *see Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 993–94 (9th Cir. 2009), as well as protecting the integrity of Plaintiffs' platform and its users whose Instagram content is scraped without those users' consent, *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019) ("Facebook's ability to decisively police the integrity of its platforms is without question a pressing public interest.  In particular, the public has a strong interest in the integrity of Facebook's platforms, Facebook's policing of those platforms for abuses, and Facebook's protection of its users' privacy.").  Thus, the four requirements for a permanent injunction are met.

"[A]n injunction should be tailored to eliminate only the specific harm alleged . . . but should not be so narrow as to invite easy evasion."  *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012) (cleaned up).  Plaintiffs request the following injunction:

Mr. Sahinturk and his agents, servants, employees, successors, and assigns, and all other persons who are in active concert or participation with anyone described in Federal Rule of Civil Procedure 65(d)(2)(A) or (B) are immediately restrained and enjoined from:

1. Accessing or attempting to access Meta's service, platform, and computer systems, including Instagram;

2. Creating or maintaining any Facebook or Instagram accounts, or otherwise accessing Facebook or Instagram, in violation of the Facebook Terms of Service or Instagram Terms of Use;

3. Engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Meta's service, platform, and computer systems;

4.  Engaging in any activity, or facilitating others to do the same, that violates Instagram's Terms of Use;

5.  Engaging in any activity that lessens the distinctiveness or tarnishes the IG Marks; and

6.  Registering, using or trafficking in any domain name that is identical or confusingly similar to the IG Marks.

(Dkt. No. 29-3 at 2-3.)

The Court finds that the permanent restraint on the use of Meta services, platforms, and computer systems as described in the first injunctive request is overbroad.  The use of "Meta" may be read to prohibit Mr. Sahinturk from permissibly accessing all current and future Meta services, platforms, and computer systems, not just Facebook and Instagram.  Such an expansive restraint is not tailored to eliminate the specific harms alleged.  *Skydive Ariz.*, 673 F.3d at 1116.  Accordingly, the Court will delete the first request in its entirety.  *See, e.g., E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297-98 (modifying overbroad permanent injunction to eliminate only the specific harm alleged).

## CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiffs' motion for default judgment and awards statutory damages in the amount of $125,000, as follows:

1.  $25,000 for cybersquatting in connection with the domain name jolygram.com;

2.  $25,000 for cybersquatting in connection with the domain name imggram.com;

3.  $25,000 for cybersquatting in connection with the domain name imggram.net;

4.  $25,000 for cybersquatting in connection with the domain name finalgram.com; and

5.  $25,000 for cybersquatting in connection with the domain name ingram.ws.

15 U.S.C §§ 1117(c)(2), (d).  Furthermore, the Court issues an injunction permanently enjoining and restraining Mr. Sahinturk, and his agents, servants, employees, successors, and assigns, and all other persons who are in active concert or participation with anyone described in Federal Rule of Civil Procedure 65(d)(2)(A) or (B) from:

1. Creating or maintaining any Facebook or Instagram accounts, or otherwise accessing Facebook or Instagram, in violation of the Facebook Terms of Service or Instagram Terms of Use;

2. Engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Meta's service, platform, and computer systems;

3. Engaging in any activity, or facilitating others to do the same, that violates Instagram's Terms of Use;

4. Engaging in any activity that lessens the distinctiveness or tarnishes the IG Marks; and

5. Registering, using or trafficking in any domain name that is identical or confusingly similar to the IG Marks.

*Id.* § 1116(a).  Last, because Plaintiffs also seek attorneys' fees and costs, Plaintiffs should file supporting documentation for attorneys' fees and costs within 14 days.

This Order disposes of Docket No. 29.

**IT IS SO ORDERED.**

Dated:  May 2, 2022

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California